UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BURTON W. WIAND, as Receiver for
VALHALLA INVESTMENT PARTNERS,
L.P.; VIKING FUND, LLC; VIKING IRA
FUND, LLC; VICTORY FUND, LTD.;
VICTORY IRA FUND, LTD., AND
SCOOP REAL ESTATE, L.P.,

         Plaintiff,

v.                                      Case No. 8:10-CV-150-T-17MAP

DIANA W. CLOUD,

         Defendant.

_____/

## REPORT AND RECOMMENDATION

      This is one of many cases in this division emanating from a Securities Exchange Commission enforcement action aimed at dealing with the aftermath of a massive ponzi scheme perpetrated by Arthur Nadel, a hedge fund manager. *See S.E.C. v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM. After the SEC's action and the appointment of Burton Wiand as the Receiver, Nadel pled guilty in the Southern District of New York to a fifteen count indictment charging him with securities fraud, mail fraud, and wire fraud surrounding the events precipitating the enforcement action. The Receiver has sued numerous hedge fund investors, including Diana Cloud ("Cloud"), seeking to claw back "false profits" under two theories grounded on the same illegal scheme the indictment tracks: avoidance of fraudulent transfers under Florida's Uniform Fraudulent Transfer Act, Fla. Stat. §§ 726.101,*et seq.* ("FUFTA"), and unjust enrichment.[1] Currently, the Receiver

---

[1] These types of cases are often called "clawback" actions.

moves for summary judgment on a precise but critical issue to the determination of this action –

Nadel operated the hedge funds as a ponzi scheme during the distributions of "false profits" to Cloud

(*see* docs. 42, 53).  After considering Cloud's response (doc. 59) and the summary judgment record,

I find that no material dispute of facts exists and recommend the Receiver's motion for summary

judgment be granted.[2]

## A.  Standard of review

Motions for summary judgment should only be granted when the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, show there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A court, however,

may only consider "that evidence which can be reduced to an admissible form." *Rowell v. BellSouth*

*Corp.,* 433 F.3d 794, 799 (11th Cir. 2005).  The existence of some factual disputes between the

litigants will not defeat an otherwise properly supported summary judgment motion; "the

---

[2] The procedural posture of the Receiver's summary judgment motions warrants an explanation.  This Court convened early Rule 16 conferences in almost all of the more than 150 clawback cases and often grouped several cases at a time for such conferences in order to facilitate conversations and cooperation among counsel.  To a degree, that effort proved efficient as many cases settled and many defendants shared common resources.  Based on discussions with the parties at those conferences, the Court agreed to stagger the summary judgments.  Initially, the Receiver would file a motion for partial summary judgment on the liability issue, as the Receiver did here (*see* doc. 42).  That motion sought a finding as a matter of law that Nadel operated a Ponzi scheme from the inception.  Dependent on the ruling, the Receiver would file another summary judgment motion on damages (*i.e.,* the demand for false profits).  Given the number of cases pending, this bifurcated process, in hindsight, turned out to be too unwieldy.  With case-management deadlines pressing, the Receiver filed another motion for summary judgment (doc. 53).  Unlike the first, this one sought a summary judgment ruling on liability and damages.  The upshot of all this is that the two motions merge for decisional purposes, and the Court has considered Cloud's response to the motions.  As with all the dispositive motions in this case and the other clawback cases, the district judge has referred them to me for reports and recommendations.

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor. *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). While the court does not weigh the evidence or make findings of fact, *see Anderson*, 477 U.S. at 249-50, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

   *B. Background*

   This case is one of numerous clawback actions the Receiver has filed in this division. With a few exceptions, all the complaints are alike in their recitals about Nadel, his conduct, and the Receiver's causes of action against a defendant. Any differences are due to the peculiarities of the defendant and the dates and the amounts of the specific distributions made to a defendant. Here, for example, the Receiver alleges Cloud received distributions from June 1, 2005, through October 9, 2008, totaling $763,539.21 in false profits. *See* complaint (doc. 4, ex. A); Yip Decl. ¶ 3, September 28, 2012 (doc. 54).[3] In a number of cases, including this one, the Receiver has moved for summary

---

   [3] Per the complaint, Cloud invested in Victory Fund, Ltd. and Scoop Real Estate. Victory is a Florida Limited Partnership. Prior to November 2002, Victory Fund was known as Scoop Investments, LP. Beginning in December 2002, Victory Fund's general partner was an entity formed, owned, and controlled by Nadel, Scoop Capital. Nadel and Scoop Management were the investment manager or investment advisor for Victory Fund, and as advisor, Nadel purported to direct and execute Victory Fund's investment and trading activities. *See* complaint, ¶¶ 37-39. Scoop Real Estate is a Delaware Limited Partnership formed in October 2003. Scoop

judgment on a discreet factual determination that goes to the heart of his FUFTA claims – that Nadel operated the hedge funds as a ponzi scheme from their inception. Frankly, the Receiver frames the factual issue more broadly than required. Instead, the case-specific questions should be: Did Nadel operate the hedge funds as ponzi scheme when he made the distributions to Cloud, and if so, is the evidence so one-sided that the Receiver is entitled to summary judgment on this issue as a matter of law? Before answering those questions, however, it is helpful to understand the events leading up to the Receiver's current partial summary judgment motion and FUFTA's application to a clawback case like this one.

1. *the events leading up to the current motion*

Because these clawback cases presented overlapping legal arguments and a core of common, relevant facts, the Receiver initially filed an omnibus motion for partial summary judgment directed to a number cases, including Cloud (*see* doc. 26, ex. A).[4] In that motion, the Receiver argued for the same factual determination he seeks in his current motion before the Court (*i.e.* Nadel operated the hedge funds as a ponzi scheme from the earliest hedge fund's inception (1999)). But the prior motion differs significantly from the latter one as both sides have added to the summary judgment record and a new development occurred – Nadel's death. *See* Supplement to Receiver's Renewed Motion for Partial Summary Judgment, doc. 45.

_____

Real Estate's general partner and manager was Scoop Capital, a Florida Limited Liability Company Nadel created, owned, and controlled, and Scoop Capital was responsible for administering all facets of Scoop Real Estate, including its investment and trading activities. Scoop Capital retained Nadel and Scoop Management as the investment advisor, and Nadel purported to direct and execute the vast majority of Scoop Real Estate's investment and trading activities. *Id*. at ¶¶49-52, 62-63. *See also* Wiand Decl. (Doc. 43) setting forth facts establishing Nadel's control of Victory and Scoop Real Estate.

[4] The district judge referred these motions to me for reports and recommendations.

4

*a.  the Receiver's first partial summary judgment attempt*

In the first motion, the Receiver proffered certain items: Nadel's indictment, Nadel's plea transcript and plea agreement letter, the government's sentencing memorandum, the criminal judgment, and some of Nadel's letters and personal memos.  Armed with this record, the Receiver argued that the clawback defendants, including Cloud, should be "precluded from litigating facts necessarily established" by Nadel's guilty plea in the Souther District of New York (*see* doc. 26 at 10).  Such a finding would have created the irrefutable presumption of an actual intent to defraud creditors beginning in 1999, the start date of the ponzi scheme.  I interpreted the Receiver's argument to be a form of offensive collateral estoppel or some stand-alone doctrine of preclusion (*e.g.*, doc. 26, at 10 n.3).  Many defendants objected to this novel theory along two themes: offensive collateral estoppel did not apply to them and they needed to conduct additional discovery.  After considering the Receiver's omnibus motion and the numerous responses made by the clawback defendants, I concluded offensive collateral estoppel did not apply.  *See* doc. 32, Omnibus Order dated February 3, 2012.[5]  Nonetheless, I deferred any consideration of the motion's remaining aspects for a number of reasons so that the defendants could conduct further discovery and the Receiver could supplement the summary judgment record and address my evidentiary concerns about

---

[5]   The Receiver continues to make his "preclusive effect" arguments even after my February 3 Order.  I summarize the reasons why I rejected that argument in that Order here.  Offensive collateral estoppel occurs when a plaintiff seeks to foreclose the defendant from litigating an issue the defendant previously litigated unsuccessfully in an action with another party.  *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326-27 (1979).  Nadel was not a party to any of the clawback actions, and the defendants obviously were not defendants in Nadel's criminal action; accordingly, precluding the clawback defendants from being heard on the factual matters raised in their respective cases violated due process.  *Id.* at 327 n.7.  For these reasons and those outlined in the February 3 Order, the Receiver's arguments on this score are not well taken.

5

the then state of the record.[6] *Id.*  Despite the fact that I deferred issuing a report and recommendation on the Receiver's initial partial summary judgment, the February 3 Order has distinct, contextual relevance to the current summary judgment record.

### b. the February 3 Order

Aside from putting off the consideration of the summary judgment issues until further discovery could occur, the February 3 Order forewarned the parties, and particularly the clawback defendants (including Cloud), about two interrelated points I considered important to the determination of any future summary judgment motion.  The first reminded the clawback defendants about their obligations when responding to a summary judgment motion:

> [I]f the moving the moving party makes the required showing, the burden shifts to the non-moving party to rebut that showing by producing counter-evidence in admissible form,  *Celotex Corp. v. Catrett,*  477 U.S. 317, 324 (1986); and the existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion unless the dispute presents a "*genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original).[7]

The second point underscored the evidentiary significance of Nadel's criminal proceedings for summary judgment purposes.  In short, while Nadel's judgment did not carry any preclusive effect (as the Receiver argued), the clawback defendants could not ignore the summary-judgment heft of the criminal proceedings and the significant evidentiary hurdle those proceedings posed to

_____

[6]  I also determined that Nadel's letters and memos were clearly inadmissible hearsay under Fed. R. Evid. 804(b)(3) because the Receiver had not shown Nadel to be unavailable as a witness under Fed. R. Evid. 804(a).  Because a court evaluating a summary judgment motion may only consider that evidence which can be reduced to an admissible form, these items were unacceptable for summary judgment purposes.  *See Rowell,* 433 F.3d at 800.

[7]  *See* doc. 32 at 4.

them.  My admonitions about this were specific (doc. 32 at 7-9)[8]:

> Nadel's plea transcript, however, is appropriate for summary judgment consideration either under Fed. R. Evid. 807 or as a declaration or deposition for purposes of Rule 56(c).  In short, the plea transcript carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008) (applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition).  The same would be true for Nadel's sentencing hearing transcript, although Wiand does not include it with his motion.

> Particularly significant is Fed. R. Evid. 803(22)(C)'s application, which Wiand does not address.  That rule, which applies irrespective of the declarant's availability, states that evidence of a final judgment of conviction based on a guilty plea is admissible if the evidence is admitted to prove "any fact essential to the judgment."  *See Scholes v. Lehmann*, 56 F.3d at 762 (applying rule  in clawback action at summary judgment stage).[9]  Of particular evidentiary significance, which none of the parties mention, is the judgment's order directing Nadel to pay $174,930,211.07 in restitution.  This figure, which corresponded to the loss calculation for guideline sentencing purposes, covers losses the fraud victims incurred from 1999 to 2009.[10]  So too is the amount Nadel forfeited to the

---

[8]  For the ease of the reader, the footnotes appearing in the February Order are not copied in the body of the quoted text but as a newly numbered footnote which identifies the copied footnote in the Order.

[9]  As the Order noted (doc. 32 at n.10):
Per Rule 802(22)'s advisory committee note, "[w]hen the status of a former judgment is under consideration in subsequent litigation, three possibilities must be noted: (1) the former judgment is conclusive under the doctrine of res judicata, either as a bar or a collateral estoppel; or (2) it is admissible in evidence for what it is worth; or (3) it may be of no effect at all … The rule does not deal with substantive effect of the judgment as a bar or collateral estoppel.  When, however, the doctrine of res judicata does not apply to make the judgment either a bar or a collateral estoppel, a choice is presented between the second and third alternatives.  The rule adopts the second for judgments of criminal conviction of felony grade."

[10]  As the Order noted (doc. 32 at n. 11):
From the government's sentencing memorandum (by its silence on the issue), it appears that Nadel did not contest the probation officer's loss calculations as set

government ($162 million).[11]  Both amounts are dependent on facts essential to their calculations.

The statutory sentencing scheme enforces the adjudicatory effect to be given to the restitution order.  For example, 18 U.S.C. § 3664(*l*) provides:

> A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal or State civil proceeding, to the extent consistent with State law, brought by the victim.[12]

And per 18 U.S.C. § 3664(m)(1)(B), at the request of a victim named in the restitution order, the clerk is required to issue an abstract of judgment certifying the

---

out in the presentence report.  Fed. R. Crim. P. 32(c)-(f).  The presentence report and any addendum to it serve the same purpose as a pretrial stipulation in a civil bench trial, with the report setting out the factual and legal backdrop for the upcoming sentencing hearing and the addendum listing the disputed factual and legal issues that the court must decide.  *United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989).  Nadel's failure to object acknowledged the accuracy of the probation officer's loss calculation.  Of course the sentencing transcript would clearly speak to this issue as would the forensic accounting proof supporting the loss calculations.

[11]  As the Order noted (doc. 32 at n. 12):
Of particular note in criminal forfeitures like Nadel's is the relation-back doctrine, which operates retroactively to vest title in the government effective as of the time of the act giving rise to the forfeiture.  *United States v. Bailey*, 419 F.3d 1208, 1213 (11th Cir. 2005).  *See also United States v. 92 Buena Vista Ave.,* 507 U.S. 111, 125 (1993).  Wiand does not include the forfeiture order issued by the court in the Southern District of New York.

[12]  As the Order noted (doc. 32 at n. 13):
Although I find no cases interpreting the scope of 18 U.S.C. § 3664(*l*), the provision simply implements issue preclusion or collateral estoppel principles.  By its strict wording, it plainly would not apply to these clawback actions as they are not technically suits initiated by a "victim," despite Wiand's equitable, fiduciary obligations to the victims.  However, the practical effect of Nadel's conviction is that he will not be able to deny essential facts that judgment necessarily incorporates.  *Scholes v. Lehmann*, 56 F.3d at 762 (when considering summary judgment motion, a witness should not be permitted by a subsequent affidavit to retract admissions made in plea agreement).

judgment in the victim's favor as noted therein and thereby allowing the victim to enforce the judgment as lien on property of the defendant. The upshot of Rule 803(22) is that the Defendants are not looking at a blank summary judgment slate.

The Order's conclusion again reminded the defendants about their burden-shifting obligations under the summary judgment scheme: "Nadel's criminal conviction, and the facts it necessarily embraces, not to mention the accessible proof available from that prosecution, are convincing evidentiary hurdles Wiand puts out for the Defendants to meet." *See* doc. 32 at 9-10.

### c. new evidentiary material and Nadel's death

The Receiver's summary judgment papers move for the same factual finding as the original motion for partial summary judgment but add new evidentiary material including: the criminal judgment against Nadel on counts one through and fifteen in the indictment, the restitution order included within that judgment in the amount of $174,930,311.07, the sentencing transcript, the forfeiture order, and the declaration of forensic accountant Maria Yip. *See* docs. 43-17; 43-18; 43-19; 44 (Yip Decl., March 23, 2012); 47 (Yip Supp Decl., May 11, 2012); 52 (Revision to Yip Decl., July 19, 2012); 54 (Yip Decl., Sept. 28, 2012). Moreover, in light of Nadel's death on April 16, 2012, the previous complaints about Nadel's personal letters and memos dissipated. The Receiver now satisfied the unavailability demands of Fed. R. Evid. 804(a), and Nadel's statements against interest are appropriate evidentiary considerations for summary judgment purposes.

### 2. FUFTA

A vast majority of states have adopted the Uniform Fraudulent Transfer Act (UFTA), an act "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *BMG Music v. Martinez,* 74 F.3d 87, 89 (5th Cir. 1996). Federal district and bankruptcy courts adopt a largely uniform practice allowing receivers to bring suits under UFTA against ponzi scheme

9

investors to the extent that investors have received payments in excess of the amounts invested and those payments are avoidable as fraudulent transfers. *Donell v. Kowell,* 533 F.3d 762, 770 (9th Cir. 2008) ("the policy justification is ratable distribution of remaining assets among all defrauded investors").   Hence, the innocent "winners" in a ponzi scheme should not be permitted to "enjoy an advantage over later investors sucked into the ponzi scheme who were not so lucky." *Id.* citing *In re United Energy Corp.,* 944 F.2d 589, 596 (9th Cir. 1991).

Under Florida's version ("FUFTA") (*see* Fla. Stat. § 726.101, *et seq.*), like other UFTA schemes, a receiver may proceed under two theories, actual fraud or constructive fraud. *See e.g. Wiand v. Waxenberg,* 611 F.Supp. 2d 1299, 1318-19 (M.D. Fla. 2009); *In re World Vision Entertainment, Inc.*, 275 B.R. 641 (M.D. Fla. 2002).   And in count I, the Receiver proceeds under both of these theories.   Under Fla. Stat. §726.105(1)(a), codifying actual fraud, the Receiver claims the transfers of false profits were fraudulent because Nadel (the debtor) caused the hedge funds to make the transfers to Cloud as part of a scheme with actual intent to hinder, delay, or defraud creditors of Nadel, the fund managers and/or the hedge funds.[13]   As such, the Receiver alleges a right to repayment of the investors' commingled principal investment money in an amount equivalent to Cloud's false profits from one or more of the hedge funds.   The Receiver also proceeds

_____

[13]   The Receiver alleges that in light of the right to repayment, the hedge funds have a claim against Nadel and consequently are creditors of Nadel under FUFTA; thus, Nadel is a debtor under FUFTA.   For this case, the Receiver contends that the transfers of false profits to Cloud were inherently fraudulent because they were made as part of Nadel's scheme.   As representative of the receivership entities (the hedge funds), the Receiver asserts he is entitled to avoid and recover transfers equal to the amount of false profits that Nadel caused the hedge funds to make to Cloud, and any other pertinent remedy available under Fla. Stat. §726.108, because the money was commingled among hedge funds and Nadel used the hedge funds as a single, continuous scheme. *See* doc. 4, ¶¶ 105-112.

under Fla. Stat. §§ 726.105(1)(b) and 726.106(1), for constructive fraud.[14]  *See* doc. 4, ¶¶ 109-112.

Where a debtor engages in a ponzi scheme, proof of a ponzi scheme satisfies UFTA's "actual intent to hinder, delay, or defraud creditors" requirement.  *See Donell, supra,* 533 F.3d at 770-71 citing *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995) (general rule is that to extent innocent investors received payments in excess of amounts of principal originally invested, payments are avoidable as fraudulent transfers); *Wiand v. Waxenberg,* 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009) citing *In re McCarn's Allstate Fin. Inc.,* 326 B.R. 843, 850 (M.D. Fla. 2005) (existence of a ponzi scheme suffices as a matter of law to prove actual intent to defraud for purposes of Fla. Stat. §725.105(1)(a).   To prove a ponzi scheme, the Receiver must establish: (1) deposits made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.  *Waxenberg, supra,* at 1312.  Here, the Receiver's motion for summary judgment

---

[14]  A transfer is fraudulent under a theory of constructive fraud if the transferor does not receive reasonable value in exchange and the transferor either (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the transferor were unreasonably small in relation to the business or transaction; (2) intended to, believed, or reasonably should have believed that he or she would incur debts beyond his or her ability to pay them as they became due; or (3) was insolvent at the time of the transfer.  *See* Fla. Stat. §§ 726.105(1)(b)(1)-(2) and 726.106(1).  The Receiver asserts that the transfers were also fraudulent under Fla. Stat. § 726.105(1)(b) because Nadel caused the hedge funds to make those transfers and Nadel, the fund managers, and the hedge funds were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction, or Nadel intended that he, the fund managers, and/or the hedge funds incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due. Finally, the Receiver asserts that the transfers were fraudulent under Fla. Stat. § 726.106(1) because neither Nadel, the fund managers, nor the hedge funds received a reasonably equivalent value in exchange for those transfers to Cloud, and Nadel, the fund managers, and the hedge funds were insolvent at all relevant times.  *See* doc. 4, ¶¶ 109-110.

adopts this ponzi-scheme method to establish that the monies transferred to Cloud were fraudulent transfers in violation of §726.105(1)(a).

Although the Receiver points to the start date of Nadel's scheme as the critical date, the relevant period is the time of the transfers. *In re Old Naples Sec., Inc.,* 343 B.R. 310, 319 (M.D. Fla. 2006) (examining intent at time transfers made when interpreting Fla. Stat. §726.105(1)(a)); *Veigle v. U.S.,* 873 F.Supp. 623 (M.D. Fla. 1994) (determining transferor's intent to defraud at time transfer made for purposes of Fla. Stat. 726.105(1)(a)); *Bay View Estates Corp. v. Southerland,* 154 So. 894 (Fla. 1934) (fraud rests upon debtor's intent at time of the transfer).   Hence, whether Nadel operated the hedge funds as ponzi scheme as early as 1999, as the Receiver proposes, is an unnecessarily broad question to examine.   For Cloud, the relevant time is from June 1, 2005, through October 9, 2008, the beginning and ending dates of her distributions. *See* doc. 4, ex. A.  Accordingly, if the Receiver's ponzi-scheme evidence for this period is one-sided (i.e., the evidence of actual intent to hinder, delay, or defraud creditors is so one-sided), the Receiver is entitled to summary judgment on the issue.  *Anderson,* 477 U.S. at 255 (when confronted with a summary judgment motion a court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"); *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (same).

*C.  Discussion*

With the above principles in mind, the summary judgment record overwhelmingly points to the fact that Nadel operated the hedge funds as a ponzi scheme by the time Cloud received her first distribution in June 2005.  In sum, the Receiver's forensic accountant confirms what Nadel admitted in his criminal proceedings and that court adjudicated.  Even when the summary judgment record

12

is viewed in Cloud's favor, Cloud offers little to overcome the Receiver's properly supported motion.

### 1. an overview of the scheme

From 1999 through January 2009, Nadel, through Scoop Capital, LLC ("Scoop Capital") and Scoop Management, Inc. ("Scoop Management"), along with Christopher Moody and Neil Moody, through Valhalla Management, Inc. ("Valhalla Management") and Viking Management, LLC ("Viking Management") (Scoop Capital, Scoop Management, Valhalla Management, Viking Management are collectively the "fund managers") managed certain hedge funds including Valhalla Investment Partners, L.P. ("Valhalla Investment"), Viking Fund, LLC ("Viking Fund"), Victory IRA Fund, LLC ("Viking IRA Fund"), Victory Fund, Ltd. ("Victory Fund"), Victory IRA Fund, LTD ("Victory IRA Fund"), and Scoop Real Estate, LP ("Scoop Real Estate").   And throughout this period, Nadel misrepresented the hedge funds' performance.   By defrauding investors through his control over the fund managers and the hedge funds, Nadel raised over $350 million dollars from hundreds of investors.   While a large majority of hedge fund investors received no distributions of purported profits, or received distributions in amounts less than their investments, a number of investors received hedge fund distributions that exceeded their investments.

In late 2008 or early 2009, the house of cards crashed.   The SEC filed an emergency action in this division on January 21, 2009, asking for a wide-ranging temporary injunction freezing Nadel's assets, requiring him to provide a sworn accounting, and prohibiting his travel outside the United States.   The district judge quickly granted the request.   *See Securities and Exchange Commission v. Arthur Nadel, et al.,* Case No. 8:09-cv-87-T-26TBM.   Coinciding with these events, a magistrate judge in the Southern District of New York issued a warrant for Nadel's arrest based

on a complaint charging Nadel with securities fraud and wire fraud.  At some point during all this

(and likely before the enforcement order), Nadel fled.[15]  Eventually, the complaint in the Southern

District ripened into a fifteen-count indictment that charged Nadel with securities fraud (counts one

through six), mail fraud (count seven), and wire fraud (count eight through fifteen).  Nadel pleaded

guilty to all the counts, was sentenced to 168 months in confinement, and ordered to pay

$174,930,311.07 in restitution (doc. 60).  He died in prison on April 16, 2012.

### 2. Yip's analysis

The Receiver submits the analysis of his forensic accountant, Maria M. Yip ("Yip"), to

support his contention that Nadel operated the hedge funds as a ponzi scheme.  Yip analyzed records

from 29 bank accounts, 24 brokerage and trading accounts, the hedge funds and fund managers'

books and records, accounting records of the receivership entities, Advent Software investor

accounting system activity, member status reports, tax records for Traders Investment Club and the

receivership entities, and reports prepared by Riverside Financial Group analyzing account activity

for brokerage accounts ("the Nadel documents").[16]  Yip opines that from at least December 1999

through January 2009, Nadel through the fund managers managed the hedge funds and grossly

---

[15]  All this is in the public record.  Nadel was arrested and appeared in this division for removal proceedings on the Southern District's warrant.  *See United States v. Arthur G. Nadel*, Case No. 8:09-MJ-1039-MAP (doc. 5).

[16]  Affidavits such as Yip's have routinely been admitted to demonstrate that an enterprise operated as a ponzi scheme and was consequently insolvent.  *Stenger v. World Harvest Church, Inc.,* 2006 WL 870310, *11 (N.D. Ga. 2006) citing *In re Lake Country Invs.,* 255 B.R. 588, 595-96 (Bankr. N.D. Idaho 2000) (expert affidavit sufficient); *In re Ramirez Rodriguez,* 209 at 431 (expert affidavit sufficient); *In re Colonial Realty Co.,* 209 B.R. 819, 821-22 (Bankr. D. Conn. 1997) (expert affidavit sufficient); *In re Taubman,* 160 B.R. 964, 976-80 (Bankr. S.D. Ohio 1993) (expert affidavit sufficient); *In re Int'l Loan Network, Inc.,* 160 B.R. 1, 7-10 (Bankr. D.D.C. 1993) (expert affidavit and prior judicial decisions sufficient).

misrepresented their performance, and defrauded investors through his control of the hedge funds

(Yip Decl. ¶ 25, March 23, 2012).[17]   Yip further opines:

> Based on our review and analysis of the documents, Nadel in combination with Christopher Moody and Neil Moody raised at least $327 million from investors between May 1999 and January 2009.  The money was raised in connection with more than 700 investor accounts.  The money was raised as part of a single, continuous Ponzi scheme.  Investors received statements ("Investor Statements") on a monthly basis for each of their respective accounts.  These Investor Statements showed purported appreciation and increase in Investor Account balances that were in fact not true.  Providing these fictitious balances not only maintained the investors "in the dark" about the actual performance of these funds but just as important, it served as the basis for the Management Fees that the Fund Managers charged to each of the Investor Accounts.

Yip Decl. ¶¶ 47-50, March 23, 2012; Revision to Yip Decl. ¶8 (revising amount raised from $336 million to $327 million based on further review and analysis), July 19, 2012. Yip's review of the financial records and comparison of balance of principal invested by investors according to the K-1s issued by the hedge funds with the actual balance in the bank, brokerage and trading accounts during the years 1999 through 2008 revealed that Nadel significantly misrepresented the values in the investor accounts and the investor accounts had a fraction of the purported balances (Yip Decl. ¶59, March 23, 2012; Revision to Yip Decl. ¶9, July 19, 2012).  She finds, based on a comprehensive review of the books and records of the hedge funds, that the funds were insolvent as early as 2000 and through and including January 2009 (Yip Decl. ¶82, March 23, 2012; Revision to Yip Decl. ¶10, July 19, 2012).

Yip states that Nadel, in combination with Christopher Moody and Neil Moody, raised $327

---

[17]  Yip relied upon a memo/letter of Nadel's dated on or about February 5, 2009, that he provided false gains as early as 1998.  *See* Yip Decl n.2, March 23, 2012 (citing *U.S. v. Nadel*, U.S. District Court for the Southern District of New York, case no. 1:09-cr-00433-JGK (doc. 71-6)).

million from investors in connection with more than 700 investor accounts between May 1999 and

January 2009. *See* Yip Decl. ¶¶ 47-48, March 23, 2012; Revisions to Yip Decl. ¶8, July 19, 2012.

Her report indicates that investors received monthly statements for each of their respective accounts

showing purported appreciation and increase in investor account balances that were in fact not true.

Yip Decl. ¶ 50, March 23, 2012. Nadel controlled a number of bank, brokerage, and trading

accounts from July 1999 through January 2009, and he transferred money received from investors

among a number of those accounts. Investor funds were directly deposited into bank accounts

maintained at SouthTrust (later acquired by Wachovia), Bank of America, and Northern Trust, and

funds from these bank accounts were transferred to brokerage accounts for the purpose of investing

the investors' funds. Yip Decl. ¶¶ 51-53, March 23, 2012. Funds from these brokerage accounts

were transferred back to the Hedge Funds' respective bank accounts to pay management fees based

on purported account balances, management fees based on purported profits, and redemptions to

investors. Nadel also transferred funds from these brokerage accounts to other accounts he

controlled, including personal bank accounts at Wachovia Bank with names similar to Hedge Fund

accounts. Yip Decl. ¶¶ 55-56, March 23, 2012. According to Yip, "Nadel created these accounts

for two Hedge Funds on whose behalf he did not have authority to act ... [and he] had complete

access and control of the funds deposited into these accounts." Yip Decl. ¶ 56, March 23, 2012.

Yip further declares that Nadel pooled funds received from investors and deposited into

accounts, commingled these funds with other investors' money, and transferred the money from

those accounts into other bank, brokerage, and trading accounts in which the money was further

pooled and commingled with other investors' money. Yip opines that her review revealed that

"Nadel pooled and commingled investors' monies regardless of with which Hedge Fund the monies

16

had been invested; that Nadel not only commingled the monies in these accounts, he would also transfer funds into the brokerage accounts as necessary in order to have sufficient funds from which to pay redemptions; and that these funds would be transferred from the Hedge Fund brokerage account to the Hedge Fund bank account from which the investor would receive his or her redemption." Yip Decl. ¶ 58, March 23, 2012.

According to Yip, the balances of the principal invested by investors, as reflected by the K-1s issued by the Hedge Funds during the years 1999 through 2002, clearly showed that Nadel significantly misrepresented the values in the investor accounts, which had only a fraction of the purported balances. Yip Decl. ¶ 59, March 23, 2012; Revisions to Yip Decl. ¶9, July 19, 2012. *See* Table comparing balance of principal invested compared to actual account balances; Yip Decl. Ex. 59, March 23, 2012, containing balances purportedly in the accounts for the investors at each quarter end during the period of January 2003-December 2008. For example, according to Advent's investor statements, at the end of the first quarter of 2003 investors had invested a total of $49,363,230 with Nadel and the hedge funds, when in actuality the total balances in the bank, brokerage and trading accounts were $19,987,238. And, at the end of the fourth quarter of 2008, investors had invested a total of $294,512,345 with Nadel and the hedge funds when in actuality the total balances in the bank, brokerage and trading accounts were $1,338,471. Yip Decl. ¶ 61, March 23, 2012.

Yip concludes that analysis showed that for each quarter between the first quarter of 2003 and the fourth quarter of 2008, the Hedge Funds always had significantly less money in the financial accounts than the amounts deposited by investors. Yip Decl. ¶ 64, March 23, 2012. Moreover, Nadel also controlled Traders Investment Club, another investment vehicle purportedly operated separately from the hedge funds. Yip opines that, similar to the hedge funds, Nadel represented to

17

investors that he had achieved high rates of return in order to induce investors to invest. Yip Decl. ¶ 28, March 23, 2012. Yip reviewed Traders' brokerage statements, Traders' bank statements, yearly federal income tax returns, Partners' Capital Balances statements from Advent and Individual Account Statements, and concluded that Nadel utilized investor principal to pay new investors, and in fact, used investor monies from the hedge funds to pay for Traders' investors' redemptions. Yip Decl. ¶¶ 65-72, March 23, 2012. As early as 2003, Traders did not have the assets necessary to pay the amounts represented as owed to investors, and investor distributions were paid with new investor funds, often from the Hedge Funds. Yip Decl. ¶ 74, March 23, 2012.

Nadel's records, according to Yip, show that Nadel lost more than $23 million over the period of September 1999 through December 2008. Specifically, Scoop Real Estate LP lost $6,637,880; Valhalla Investment Partners lost $3,114,011; Victory Fund Ltd. And Victory Funds IRA Fund lost $4,209,134; and Viking Fund LLC and Viking IRA Fund, LLC lost $9,116,715. Yip Decl. ¶ 78, March 23, 2012. Yip's review did not reveal any other sources of funding for Nadel's hedge funds or fund managers other than a negligible amount from Scoop Real Estate representing less than 1% of the funds. Yip Decl. ¶ 79, March 23, 2012. After a comprehensive review of the books and records of the hedge funds that the funds were insolvent as early as 2000 and through and including January 2009.[18] Revisions to Yip Decl. ¶10 Table, July 19, 2012 (reflecting year end

_____

[18] Yip defined solvency as "an entity that has sufficient current assets to meet or exceed current liabilities." She defined insolvency to the extent that "liabilities exceed the assets of the entity and its ability to meet these obligations." The books and records reviewed included bank statements, check copies, cancelled checks, wire transfer documentation, deposit slip, deposit confirmations, tax returns filed by the Hedge Funds, QuickBooks records and information maintained on the Advent system. Yip additionally reviewed correspondence in which Nadel admitted to: using all of our liquid assets to cover redemptions and withdrawals, nothing is left." in a letter to his wife, Peg. The assets were calculated based on detailed analysis of actual balances in each bank and brokerage accounts as well as other assets recorded by the Hedge

insolvency for years 2000-2002). *See also* Revisions to Yip Decl. Ex. 61 (Revised), July 19, 2012 (providing quarterly information reflecting insolvency during period of 2003-2008).

Cloud is one of the investors who experienced a net gain or "false profits." According to Yip, Cloud deposited a total of $5,793,830.79 in Nadel's scheme between November 2004 and January 2007, all in Scoop Real Estate. Cloud received distributions totaling $6,557,370.62: $2,757,370.62 from Victory Fund on January 9, 2008, and $3,800,000 from Scoop Real Estate between June 1, 2005, and October 9, 2008. Hence, the "false profits" amount to $763,539.83 (the amount received from the scheme in excess of the amounts invested). *See* Yip Decl.¶ 3, Sept. 28, 2012; doc. 53 at 1-2. Cloud admits to receiving transfers in these amounts.[19]

Yip's concluding opinions are:

> 1. In order for Nadel to sustain his investment operations, he required a continuous infusion of contributions from his investors. The infusion of new funds into his operation from new and existing investors allowed Nadel to meet the initial investors' request for redemptions. With the exception of the *de minimus* rental income that was generated, there is no indication of any other sources of income that Nadel could have used to pay the existing investors.

> 2. Nadel created the classic Ponzi scheme by paying existing investors with deposits from new and existing investors. In my opinion, based on the extensive information that I have reviewed, it is evident that the combination of the actual losses coupled with the ever growing management fees (based on inflated balances from purported gains) caused the ultimate collapse of this Ponzi scheme because

---

Funds in its QuickBooks records. The liabilities were calculated as the obligations to the investors for the principal they had invested and liabilities recorded by the Hedge Funds in its QuickBooks records. Yip Decl. ¶¶ 80-81, 83-86, March 23, 2012.

[19] Cloud objects to the dates of distribution. She says that the distributions listed for October 10, 2007 and January 9, 2008 appear to have been made in September 2007 and December 2007, respectively. I find that these discrepancies are not material to the issues before me. *See* Morello Decl., ¶5 (doc. 55); Cloud's responses to Receiver's First Set of Requests for Admissions, Ex. D and E to Morello Decl (doc. 55-3).

there was no way for Nadel to meet the investors' redemption requests without the use of new funds from existing investors and funds from new investors.

3. Based on my analysis of the information that we reviewed, it is clear that Nadel operated a Ponzi scheme through Hedge Funds and Fund Managers from at least May 1999 through January 2009, when the funds collapsed.

4. The Hedge Funds were insolvent as early as 2000 through and including January 2009, when the funds collapsed.

5. Traders' raised funds from investors beginning as early as May 1999, paid out Management Fees on purported profits yet did not have trading activity until July 2003.

6. Similar to the Hedge Funds, Traders also operated as a Ponzi scheme misrepresenting purported profits to investors and using the monies of new investments from existing investors or monies from new investors to meet the redemption of existing investors, in furtherance of Nadel's Ponzi scheme.

Yip Decl. ¶¶87-92, March 23, 2012.   In her revisions to her declaration, Yip further stated that:

Pursuant to a review of bank statements, cancelled checks, wire information, deposit slips, copies of checks, QuickBooks files, federal tax returns, Advent software information, and investor files maintained by the Hedge Funds, the investors of the Hedge Funds and Traders incurred losses in excess of $168 million.

Revision to Yip Decl. ¶12, Ex. B (schedule of gains and losses for each investor account), July 19, 2012.

### 3.  Nadel's criminal proceedings and admissions

Nadel's admissions, his plea agreement, his testimony at his plea and sentencing hearings, and his criminal judgment are persuasive evidence supporting the Receiver's motion for partial summary judgment for the reasons I stated in my Order of February 3 and reiterated in Part B.1.b of this report.  Nadel's guilty plea is appropriate for summary judgment consideration either under Fed. R. Evid 807 or as a declaration or deposition for purposes of Rule 56(c) and carries a heightened standard of reliability and trustworthiness.  *See In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008)

(applying Rule 807's residual hearsay exception due to proceeding's reliability); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (a defendant's admissions in a guilty plea proceeding and in a plea agreement that is part of the guilty plea carry "veracity safeguards" exceeding a deposition). *See generally In re Rothstein,* 2010 WL 5173796 (S.D. Fla. Dec. 14, 2010) ("[c]riminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's fraudulent intent" and "criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions"); *LaBella v. Bains,* 2012 WL 1976972 (S.D. Cal. May 31, 2012) (granting summary judgment for receiver against multiple defendants where court took judicial notice of ponzi schemer's guilty plea agreement and found that he operated a ponzi scheme with actual intent to defraud creditors under UFTA); *In re Madoff,* 445 B.R. 206 (S.D. N.Y 2011) quoting *In re Slatkin, supra,* 525 F3d at 814 ("A debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent ... as a matter of law"); *Armstrong v. Collins,* 2010 WL 1131158 (S.D. N.Y March 24, 2010 (finding schemer who defrauded investors ran a ponzi scheme and that the entities involved were never solvent based on schemer's testimony, his guilty plea and expert opinion). *See also In re McCarn's Allstate Finance, Inc.,* 326 B.R. 843, 851 (M.D. Fla. 2005) ("Even if the information or indictment did not specifically label the fraud a 'Ponzi scheme,' if the allegations in the information establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence of a Ponzi scheme.").

When Nadel entered pleas of guilty to all the indictment's counts, he acknowledged, under

oath, his understanding of the accusations and that a factual basis supported his pleas.  *See* doc. 43-15 at 10.  Likewise, in his plea agreement, Nadel acknowledged that he was pleading guilty because he was in fact guilty (doc. 43-15).  As the Receiver points out, during Nadel's allocution, Nadel explained:

> Beginning in about 2002 and continuing to January 2009, I engaged in knowingly and willfully fraudulent activity for the purpose of obtaining money from investors in the funds and converting the investors; money to my own use.  To do so, I fabricated inflated rates of return from my trading activities and fabricated the net asset value of each of the funds.  Using these fabricated numbers, I repeatedly communicated to investors and prospective investors that the funds had consistent and extremely positive performances and rates of return and that the net asset value of each of the funds was in the tens of millions of dollars. These communications were knowingly and willfully made false and made for the purpose of inducing investors to invest and keep their money in the funds.[20]

*See* Guilty Plea Transcript, doc. 43-15, at 30.  Nadel further stated that he directed his broker to make certain wire transfers among accounts that he controlled "for the purpose of facilitating and concealing the scheme to defraud . . . ."  *Id.* at 31.

At the sentencing hearing, Nadel spoke of his "victims" and clearly acknowledged his guilt:

> I have had almost two years to think about the victims in my case.  I have pictured myself in their position while visualizing the faces and hearing the voices of those I knew personally.  Recently I read their letters over and over again, until their anger and outrage became mine at myself.  I experienced a steep dissent into regret and remorse followed by sorrow and self-hatred, into a deep depression.  It took great effort to struggle out of it.

> I spend most of my time in examination of my life not to excuse but to try to

---

[20] Although Nadel's sworn statements are obvious evidence that he operated the hedge funds as a ponzi scheme by the time of the applicable distributions here, Nadel's temporal recollection is self-serving and contradicted by the record in the criminal case.  For example, the sentencing-guideline loss calculation dated back to 1999, a fact that Nadel did not object to at his sentencing proceeding.  And at other times discussed *infra,* Nadel acknowledged he "doctor[ed]" continuing losses for more than 10 years and that the hedge fund losses could be calculated by going back to 1998.

> understand my harmful past behavior.  I blame no one but myself for my acts and observe that I have been my own worst enemy.  In effect, I have thrown away everything I have lived for: Family, friends, social acceptance, and honor, a sense of self-worth and accomplishment, all my possessions and, finally, freedom itself.

*See* Sentencing Transcript, doc. 43-18, pp.15:23-16:12.  Nadel did not object to the restitution amount, nor did he object to those victims identified in his presentence report and included in his judgment.  Similarly, when the court advised Nadel of the forfeiture calculation, $162 million, his counsel represented that he had no objection.  *See* Preliminary Order of Forfeiture (doc. 43-19), and Sentencing Hearing Transcript (doc. 43-18).  The court sentenced Nadel to 168 months of imprisonment.  *See* Judgment, doc. 43-17.  Nadel's plea agreement, his sworn admissions, his guilty plea, his failure to object to the court's restitution and forfeiture calculations (both premised on his scheme spanning from 1999 to 2009), and court's judgment support Yip's findings.[21]

Nadel's own statements further support the Receiver's motion.  In a January 2009 letter found in a hedge fund office shredder by a Scoop Management employee ("Shredded Letter"), Nadel admitted that "[f]or more than ten [years], I have truly believed that [I could] trade my way out of this mess, and [only] in 2008 did it finally penetrate my addled [brain] that this is not to be.  I have managed to ruin hundreds of lives, and I deserve whatever [I] ultimately receive."  Nadel also sent a letter to his family after he disappeared in January 2009 admitting that he had been attempting to "'doctor' continuing losses for almost 10 years."  In the letter, Nadel suggested that the hedge funds losses could be calculated by "go[ing] back as far as possible, to 1998 if we can, to Spear, Leads & Kellogg from Goldman, Sachs, and determine the actual trading losses."  He stated that his

---

[21]  As I noted in my Order of February 3, Nadel's failure to object to probation officer's loss calculation in the presentence report admits its factual accuracy.  *See United States v. Wise,* 891 F.2d 970, 972 (11th Cir. 1989).  This restitution amount (almost $175 million) corresponded with losses to victims from 1999 to 2009.

"recollection of the more recent losses, say from 2001 on, is about an average of $20 million per year. ..."   Nadel wrote a confidential memo that provided a background of himself and the hedge funds, including the operation of the investment clubs before the formation of the hedge funds.  In the confidential memo, Nadel wrote:

> All six [hedge funds] were traded together as a group usually ... [B]y 1999 the volatile tech bubble created losses.  When the bubble burst I began to "doctor" the trading results.  It started in a small way, but as the assets increased, it became more difficult to cover the losses, and then came 9/11/2001, followed by the recession of 2002.  All of this time, I believed that I could trade my way out of the discrepancies between the stated assets and the actual assets.

doc. 27-5.  *See also* 27-2, 27-3, 27-4.[22]

### 4. Cloud's rebuttal

In response to this overwhelming evidence, Cloud offers little rebuttal evidence in admissible form.  *See Celotex Corp.,* 477 U.S. at 324 (1986) (if the moving party makes the required showing, the burden shifts to the non-moving party to rebut that showing by producing counter-evidence in admissible form).   In the main, she says that summary judgment in favor of the Receiver is inappropriate because the Receiver has failed to address "several applicable" affirmative defenses that raise triable issues of material fact.   *See* doc. 59.  First, Cloud asserts her first affirmative defense, that the Receiver's claims arising from certain early transfers are barred by the statute of limitations, creates a genuine issue of material fact.

Pursuant to Fla. Stat. § 726.110:

> A cause of action with respect to a fraudulent transfer or obligation ... is extinguished unless action is brought-
> (1) Under §726.105(1)(a), within 4 years after the transfer was made or the obligation

---

[22]  Given Nadel's recent death, all these statements are admissible per Fed.R.Evid. 804(b)(3)(A) or 807.

was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant ...

(2) Under § 726.105(1)(b) or § 726.106(1), within 4 years after the transfer was made or the obligation was incurred ...

Applying this statute, a transfer is avoidable as fraudulent under § 726.105(1)(a) if the Receiver commences an action within four years after the transfer or within one year after the transfer could reasonably have been discovered by the claimant.   The earliest transfer to Cloud occurred on June 1, 2005.  *See* doc. 4, ex. A.  However, while Nadel controlled Traders and the hedge funds, the scheme and fraudulent transfers were concealed and could not reasonably have been discovered as a matter of law.  *See generally Scholes, supra,* 56 F.3d at 754-55; *In re Blackburn,* 209 B.R. 4, 13 (M.D. Fla. 1997) (statute of limitation tolled until appointment of receiver); *Hecht v. Malvern Preparatory School*, 716 F.Supp. 2d 395, 399-400 (E.D. Pa. 2010) (deciding under Pennsylvania UFTA that wrongdoer dominated the partnership and fraudulently concealed facts and that the earliest date receiver "could have known of the purported fraudulent transfers" was the day she was appointed); *Wing v. Kendrick,* 2009 WL 1362383, *3 (D.Utah 2009) (claims filed within one year of receiver's appointment not time-barred under UFTA because "fraudulent nature of the transfers [could] only be discovered once the Ponzi operator ha[d] been removed from the scene").   The Receiver was appointed on January 21, 2009, and one year from the date of the Receiver's appointment is January 21, 2010.  The Receiver filed the original complaint in this case on January 15, 2010, within one year of the Receiver's appointment. [23] *See* Complaint, doc 4.  Cloud requests that the Court take judicial notice of a news article published on January 18, 2009, that indicating

---

[23]  Cloud indicates in her memorandum of law that the Receiver filed the complaint against her "on or about January 19, 2010."  However, the official court docket, available on CM-ECF, reveals that although the transaction was entered on January 19, 2010, the complaint was filed on January 15, 2010.  *See* doc. 1, Notice of Electronic Filing.

Nadel "burned investors tallying their losses."  But, the article does not create a material dispute of fact as to when the Receiver knew of the distributions to Cloud, as it does not indicate when the Receiver knew or could reasonably have known of the transfers to Cloud, and Cloud has not submitted any evidence on this issue.

Relying on her ninth affirmative defense, Cloud cites to the Bankruptcy Code, specifically 11 U.S.C. §547, as another basis for denying summary judgment and finding the Receiver's claims time-barred.  She asserts that any sums she received were "preference payments to a non-insider" controlled by 11 U.S.C. §547, and as such a shorter one-year statute of limitations period applies. *See* answer (doc. 22); response to Receiver's motion for summary judgment (doc. 59 at 4). However, this action is not governed by the Bankruptcy Code, and I find Cloud's reliance on it inappropriate here.

Next, Cloud maintains the Receiver failed to avail himself of an opportunity to mitigate damages.  She posits that any sums she received from Nadel were transferred to a "proximate transferee," Beau Diamond, another ponzi scheme operator, and resulted in a total loss to her.  She claims that the Receiver refused to submit a proof of claim to the Trustee of the Diamond receivership and has otherwise failed to mitigate the damages sought against her.  Hence, it seems that Cloud claims she should be able to set-off the false profits transferred to her forming the basis for this cause of action against the losses she incurred as a result of her investment in the Beau Diamond ponzi scheme.  As previously explained, FUFTA avoids all "false profits."  That Cloud elected to re-invest or roll over her "winnings" is not relevant for FUFTA purposes because those "winnings" represented an illusory transfer of profits.  In short, Cloud's profits were not hers to have. Her decision to invest the "profits" she received from her investments in Nadel's scheme need not

26

be taken into account in calculating her false profits.   To credit Cloud's re-investment would contradict the equitable considerations courts apply in clawback cases.   Set-off is an equitable concept, *see Durham Tropical Land Corp. v. Sun Garden Sales Co.*, 151 So. 327, 328 (Fla. 1932); yet, and despite the injustice suffered by Cloud who lost money in the Beau Diamond scheme, it is difficult to fathom how the defense would apply here.   And, Cloud's argument that the Receiver failed to mitigate damages by neglecting to file a claim with the trustee of Beau Diamond's receivership is misplaced, as it is Cloud's responsibility, not the Receiver's, to file such a claim.   In sum, I find equitable set-off, no matter the Court's sympathies, does not apply.

Though Cloud has not raised the issue in her summary judgment response, she had included as her third affirmative defense that she was a good faith transferee.  *See* doc. 22, third affirmative defense.   Though Cloud incorrectly cited to the Bankruptcy Code provision, the applicable statute is Fla. Stat. §726.109(1) that provides a "good faith" defense for transfers made with actual fraud under Fla. Stat. §726.105(1)(a).   Specifically, the statute provides: "A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."   However, it is well-settled that a receiver is entitled to recover from winning investors profits above the initial outlay, also known as "false profits," and  an investor in a scheme does not provide reasonably equivalent value for any amounts received from scheme that exceed the investor's principal investment.  *See Perkins v. Haines,* 661 F.3d 623, 627 (11th Cir. 2011) ("Any transfers over and above the amount of principal– i.e. for fictitious profits – are not made for 'value' because they exceed the scope of the investor's fraud claim and may be subject to recovery."); *Donell, supra,* 533 F.3d at 772 (amounts transferred by the ponzi scheme perpetrator to the investor in excess of amounts invested are considered

fictitious profits because they do not represent a return on legitimate investment activity); *Scholes,* 56 F.3d at 757.

Lastly, Cloud argues that the Receiver's motion for summary judgment should be denied as to Count II, unjust enrichment. I need not address Cloud's arguments, in light of my finding that the transfers to her are avoidable under FUFTA.

Here, the Receiver has submitted evidentiary proof, discussed *supra*, that Nadel operated a fraudulent scheme by the time Cloud received her first distribution in 2005. The summary judgment record shows: (1) Nadel controlled each of the hedge funds; (2) that Nadel used that control to commingle invested money, misrepresent hedge fund performance, and inflate hedge fund asset values; (3) Nadel caused the hedge funds to transfer investors' commingled principle investment money to satisfy "distributions" based on the hedge funds' fabricated performance data and asset values; and (4) that as a result of this conduct, Nadel was indicted and pleaded guilty to all charges in the indictment, discussed *supra,* failed to object to the government's restitution and forfeiture calculations which were based upon his scheme spanning from 1999 through 2009, and made statements, discussed *supra,* admitting his criminal activity.[24] Cloud fails to alter the overwhelming

---

[24]  *See* Wiand Decl. (doc. 43) setting forth evidence that Nadel controlled Victory Fund and the other hedge funds. In pertinent part, the declaration and the attached evidentiary documents show that Nadel incorporated Scoop Management in 2001 and served as its registered agent and sole officer and director (¶11, Ex.C); that Victory was formed in 2001 as Scoop Investments, LP, and changed its name in 2002. Victory was formed purportedly to invest in and/or trade securities including exchange traded funds (ETFs), that the general partner of Victory was Scoop Capital, which Nadel created and controlled (¶¶15, 18, Ex.G). Victory retained Nadel and his entity, Scoop Management, as their "Investment Manager." Through Scoop Management, even thought Nadel did not own Victory, Nadel was allowed to "fully control" its activities. (¶20). Scoop Real Estate was formed in 2003, purportedly to invest in real estate and/or trade securities, including ETFs. Scoop Real Estate's general partner was Scoop Capital, and Nadel was responsible for Scoop Real Estate's the day-to-day investment decisions (¶16).

quantum of evidence the Receiver presents.

### 5. false profits

The Receiver seeks $763,539.83 in false profits plus prejudgment interest.  There is no genuine issue as to whether Cloud invested in hedge funds and received transfers from the hedge funds in connection with his investments, as she admitted to receiving the distributions in her responses to the Receiver's discovery requests.  Cloud objects to the dates of distribution; however, I find the discrepancies are not material to the issues before me. *See* Morello Decl. ¶5 (doc. 55); Cloud's responses to Receiver's First Set of Requests for Admissions, Ex. D and E to Morello Decl (doc. 55-3); *supra* at n.19 (discussing date discrepancies).

### 6. prejudgment interest

This Court exercises supplemental jurisdiction over the Receiver's FUFTA claims (doc. 1, ¶8). *See* 28 U.S.C. § 1367.  As such, state law applies to any issue not governed by the Constitution or treaties of the United States or Acts of Congress.  28 U.S.C. § 1652; *Erie R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Flava Works, Inc. v. City of Miami, FL*, 609 F.3d 1233, 1237 (11th Cir. 2010); *see also* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4520.  Florida courts have long held the view that prejudgment interest is simply another element of pecuniary damages for making the plaintiff whole from the date of the wrongful loss.  *Bosem v. Musa Holdings, Inc.*, 46 So.2d 42, 45 (Fla. 2010) (reaffirming Florida's position since the turn of the last century).  An award, however, is grounded in equity and is not absolute.  *Blasland, Bouck & Lee, Inc. v. City of North Miami*, 283 F.3d 1286, 1297-98 (11th Cir. 2002) (applying Florida law).  Florida courts consider various factors when evaluating the equities.  These include the extent the plaintiff's conduct contributed to the delay between the injury and judgment, and whether the prevailing party

failed to mitigate damages; in matters involving public bodies, and in choosing between innocent victims, it is inequitable to put the burden of paying interest on the public. *Id.* The list is obviously illustrative as each case is different. But the driving focus demands balancing the equities at hand. As the Florida supreme court has said: "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." *Flack v. Graham*, 461 So.2d 82, 84 (Fla. 1984) quoting *Board of Commissioners of Jackson County v. United States,* 308 U.S. 343, 352 (1939).

In view of these principles, I conclude that to exact prejudgment interest from Cloud would be inequitable. Despite her position as a "net winner," compared to the greater number of "net losers" Nadel swindled, Cloud is certainly not a winning investor in the normal sense. Like the net losers, Cloud invested in the hedge funds assuming their legitimacy. That she received a return in excess of her investments was likely serendipitous. With the avoidance of those positive transfers (the amounts above principal invested), requiring Cloud to pay more out of her pocket in the form of prejudgment interest would not satisfy the goals for making the award. It would not make the hedge funds any more whole, as Cloud presumably could stand in line with the other net losers seeking compensation from the Receiver. Simply put, Cloud has suffered enough**.**

*D. Conclusion*

As one court recently noted:

> Ponzi schemes leave no true winners once the scheme collapses. In recognition of that unpleasant reality, courts adhere to the 'principle that equality is equity' in dealing with the aftermath of an imploded Ponzi scheme.

*Janvey v. Democratic Senatorial Campaign Comm., Inc. et al.,* 793 F.Supp. 2d 825, 858 (N.D. Texas 2011) citing *Donell, supra,* 533 F.3d at 779. Upon consideration of the evidence before me, I find

that Nadel operated the hedge funds as a ponzi scheme at the time of the transfers to Cloud, and that

the transfers to Cloud were made with the actual intent to hinder, delay, or defraud as required by

Fla. Stat. § 726.105(1)(a).  For the reasons given, it is hereby

RECOMMENDED:

1.  That the Receiver's motion for summary judgment (doc. 53) be GRANTED and that the

Clerk be directed to enter judgment for the Receiver and against Cloud in the amount of

$763,539.83.

2.  That the Receiver's renewed motion for partial summary judgment (doc. 42) be found

moot.

3.  That all pending motions be denied and the Clerk directed to close the case.

IT IS SO REPORTED at Tampa, Florida on December 17, 2012.



MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained

in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from

attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).

cc:     Hon. Elizabeth A. Kovachevich
        Counsel of Record

31